4-2700

Opinion delivered October 24, 1932.

*Chas. D. Frierson,* for appellant.

*C. T. Carpenter,* for appellee.

BUTLER, J.   This is an action for damages to lands of the appellee occasioned by the construction of Drainage District No. 7 in Poinsett County.   There was a verdict and judgment for the appellee in the trial court, from which judgment is this appeal.

Drainage District No. 7 was created for the purpose of reclaiming a large territory of swamp lands. The general description of the district may be found in the cases of *Sharp* v. *Drainage District No. 7*, 164 Ark. 306, 261 S. W. 923; *Keith* v. *Drainage District No. 7*, 181 Ark. 30, 24 S. W. (2d) 875, and *Hogge* v. *Drainage Dist. No. 7*, 181 Ark. 564, 26 S. W. (2d) 887. In the course of the construction of the district, a floodway was dug and leveed leading from the drainage district to a point on the St. Francis River practically opposite the lands of the appellee in Crittenden County. The St. Francis River and Little River were closed by dams and levees so constructed that with these dams a large territory was inclosed, and the waters which were accustomed to drain down the St. Francis and Little Rivers were diverted from a natural flow, and, with a great amount of other waters from an area above draining into the rivers, were impounded and in times of high water flowed through the floodway with such violence and in such volume as to overflow the banks of the St. Francis River, flooding the lands of the appellee and destroying its value for agricultural purposes. From the point where the St. Francis River was dammed on the southern boundary of the district to the appellee's land, following the meanderings of the stream, is an estimated distance of forty miles, while the floodway which leaves the district at a short point west of the dam is approximately nine or ten miles in length. The flow of the water is therefore greatly accelerated, resulting in a volume of water on appellee's land in a given space of time much greater than that it received before the construction of the improvement, with the result that the lands were overflowed and their agricultural value destroyed.

Among the assignments of error is that the court erred in refusing to grant instructions Nos. 4 and 5 asked by the appellant. These instructions are as follows:

"No. 4. If you find from the evidence that the flow of water is accelerated through the floodway and the height of the waters increased thereby at or near the lands of the plaintiff, but further find that said floodway, although it takes flood waters from the St. Francis River, puts the same back into the river at a lower point, then said drainage district is not liable for damage due to the floodway."

"No. 5. If you find from the evidence that the flow of water is accelerated through the floodway and the height of the waters increased thereby at or near the lands of plaintiff, but further find that said floodway, levees and dam or any one of them, if they divert water from the St. Francis River, put same back into the same river at a lower point and before it reached the land of plaintiff, then your verdict should be for the defendant."

In support of the correctness of these requested instructions, appellant relies upon the case of *Board of Drainage Commrs.* v. *Board,* 130 Miss. 764, 95 So. 75, 28 A. L. R. 1250.

The case of *Baird* v. *Drainage Dist. No. 7,* 181 Ark. 1145, 26 S. W. (2d) 892, was a case almost identical with the instant case and involved the question of injury to the fractional northwest quarter of section 5-15-6. This land adjoins the lands of appellee, and the damage to it arose from the same causes as the damage to appellee's lands. The facts in that case are not set out in the opinion nor a review of the cases upon which the drainage district relied, but its chief reliance was the principle announced in the Mississippi case, *supra,* from which extensive quotations were made. The court in that case adopted the view expressed in the case of *Mizelle* v. *McGowan,* 129 N. C. 93, 39 S. E. 729, 85 Am. St. Rep. 705, which announced the rule that the right to drain into a natural water course is not limited to the natural capacity of the stream. It was admitted, however, that the rule of the North Carolina court was against the weight of authority, and that the majority of the courts and the text-writers held that the right of the

upper owner to drain into the water course is qualified to the extent that the flow must not be increased beyond the capacity of the stream. We think it unnecessary to announce our adherence to either of the conflicting rules, because, as we see it, neither is applicable to the facts of this record. The Mississippi case was a case where, as is said in the opinion, "the water is discharged at different points and in separate quantities, not by one person nor any one body, but by many landowners acting separately and independently in the exercise of their right to drain into the natural water course of the water-shed," and in that state of case the court said: "It is true the appellees are entitled to the benefit of the rule that water should flow as it is wont to flow, but we think with this exception or qualification that it may be increased by a riparian owner who, in the reasonable exercise of his right of drainage, discharges into the stream in excess of its capacity."

In the case at bar the drainage district concentrated the surface waters of a large territory and diverted them by dams and levees from their natural flow and through an artificial channel accelerated the flow of the surface waters of the Little and St. Francis rivers, discharging it in one body into the river further down at a point practically opposite the lands of the appellee. This, therefore, is not a case, as was the Mississippi case, where upper owners drain surface waters into the water course, but where such water courses were diverted and the waters draining into them not allowed to follow the natural flow of the streams.

The instructions refused were in effect peremptory instructions, as there is no dispute but that the waters diverted by the levees and dam into the floodway finally reached again the stream of the St. Francis River at a lower point. These instructions also ignore the diversion of the waters from their natural flow, which fact is undisputed and is the basis of the cause of action.

Complaint is also made of the court's refusal to give instruction No. 9, as follows: "If you find that the defendant drainage district has not diverted the course of any stream but has simply so drawn its levee lines and constructed its ditches as to protect as much land within the district as possible and that the damage, if any, to plaintiff results solely from the placing of levee lines and ditches in such way as to protect the lands of the district, then for such damage the plaintiff cannot recover."

It is insisted that whether there was an impounding and diversion is a matter of argument, since the engineer witnesses for the appellant maintained "that the structures constituted a placing of levee lines and ditches in a manner best adapted to the protection of the lands of the drainage district as a whole." But, regardless of the opinion of these witnesses, the undisputed fact remains that the St. Francis and Little rivers were dammed and their waters diverted from a natural flow into the floodway, and thus precipitated in increased volume upon the lands of the appellee. There was therefore no question for the jury regarding the diversion of the course of any stream, and the requested instruction would have improperly submitted that issue to the jury.

The appellant requested the following instruction: "You are instructed that there was a mortgage upon the lands at the time of the bringing of the suit and also at the time of the damage complained of; and the mortgagee is not a party to the suit, and there can be no recovery for lack of complete title in plaintiff at the time of alleged injury, and your verdict will therefore be for the defendant." The appellee's lands were mortgaged, and the appellant insists that the mortgagee was a proper party and should have been joined as a plaintiff; that it knew nothing about the title until appellee, himself, in his testimony disclosed the existence of a mortgage, and that the court erred in its refusal to grant the instruction requested. Of course, at the beginning of this suit

the appellant could have discovered the existence of the mortgage and the condition of the title, had it made any investigation, and the lands being in Crittenden County would not constitute such an obstacle as would prevent an investigation of the title. The mortgagee, while a proper party, was not an indispensable one, and, by failing to raise that question by motion, demurrer or answer, it must be deemed to have waived same. *Less v. English,* 75 Ark. 288, 87 S. W. 447. The general demurrer interposed did not reach the defect of want of proper parties (*Love* v. *Cahn,* 93 Ark. 215, 124 S. W. 259) and the instruction raised the objection for the first time and was properly refused. Crawford & Moses' Dig., §§ 1189, 1190.

Complaint is also made that no instruction detailing defendant's theory except on the amount of damages was given. A sufficient answer to this is that defendant's theory has been all along that its liability for damage falls within the rule announced in *City Oil Works* v. *Helena Imp. Dist. No. 1,* 149 Ark. 285, 232 S. W. 28, that where a landowner's property is left outside of a levee he is entitled to no damages because of the failure to protect his land or because the levee as constructed may prevent water from flowing off of his land as it otherwise would or may deepen the water in an overflow of the land between the embankment and the river. In cases arising out of injuries occasioned by the construction of the appellant district we have repeatedly held that the principle contended for had no application because the damage in those cases and in the instant case was caused, not by the erection of levees to prevent streams from overflowing and for the purpose of confining waters within the bed of the stream, but because there was an obstruction of the flow of the waters in the stream and a diversion of them by dams and levees. *Sharp* v. *Drainage Dist. No. 7; Keith* v. *Drainage Dist. No. 7; Hogge* v. *Drainage Dist. No. 7, supra.*

We have discussed the assignments of error not as presented in appellant's brief, but as we view them according to their importance, and we now come to a consideration of what appears to us to be the main ground relied upon by the appellant for a reversal. Appellant contends that the complaint and evidence show that the suit is barred by the statute of limitation, and that the court should have directed a verdict for the appellant as requested in its instruction No. 1, and that, if it was not entitled to a directed verdict, it was entitled to have the question of limitation submitted to the jury by its request for instructions No. 10 (a) and No. 10 (b), which were to the effect that, if the jury should find that the damage complained of occurred more than one year before the institution of the suit, its verdict should be for the defendant.

In *Hogge* v. *Drainage Dist. No. 7, supra,* we held that on the question of limitation, § 3942 of Crawford & Moses' Digest applies. This section is as follows: "All actions for the recovery of damages against any levee or drainage district for the appropriation of land, or the construction or maintenance of either levees or drains, shall be instituted within one year after the construction of such levees or drains, and not thereafter; provided, that any person, persons, or corporations, who may have any existing claims against any levee or drainage district, suffered on account of appropriation of land, for the purpose of constructing either a levee, ditch, canal, or drain, or on account of the construction or maintenance of either a levee, ditch, canal or drain, shall bring their action within six months after the passage of this act, and not thereafter." The action in the case at bar must have been begun within one year after the construction of the district. The original complaint was filed on June 5, 1924, and it is insisted that the complaint on its face showed that the action was barred. The allegation depended upon is as follows:

"That the main waterway of defendant district was completed and opened into the St. Francis River early in the year 1923, and at and since that time such vast amounts of water were, through said waterway, discharged into the St. Francis River; that said river has been caused to overflow its banks and to entirely submerge the lands of this plaintiff and to keep them submerged during the latter part of the winter season, all of the spring season and far up into the summer season of each year, preventing the raising of crops of any kind, except a few unprofitable late crops, rendering said lands unfit and worthless for agricultural purposes, or for any other purpose whatever, and resulting in a permanent damage to the lands of this plaintiff in the sum of the value of said lands, all said damage being caused by the construction of the improvements herein described."

Several amendments to the original complaint were filed, the last one according to its recitals being filed in compliance with the ruling of the court, and, after reciting that several former amendments to the original complaints had been filed, it concludes paragraph I with the prayer that "this be treated as his complaint in chief containing all the allegations constituting his cause of action." This, therefore, was not only an amendment to the complaint, but a substituted complaint, and it was to this that the answer was filed. In this complaint the allegation in the original complaint quoted, *supra,* was omitted, and the complaint therefore contained no reference to the date on which the structures were completed, nor did the original complaint, except as to the main waterway of defendant district (the floodway). It will be observed that the point from which the statute begins to run is from the "construction of the improvement" and not from the date of the damage, so that, although the damage might have fully accrued in January, 1923, the one year statute of limitation would not begin to run from that date, but from the date of the construction of

the improvement. We are of the opinion that the term used in the statute (Crawford & Moses' Dig., § 3942) "after the construction of such levees or drains, and not thereafter," means the completion or finishing of the levees or drains, and the statute would begin to run from the completion of the work. This interpretation is warranted by the cases cited by the appellant. In *Board of Directors of St. Francis Lev. Dist.* v. *Barton*, 92 Ark. 406, 123 S. W. 382, the statute was held to run from the date when the levee was finished at that point. In *Davis* v. *Dunn*, 157 Ark. 125, 247 S. W. 793, it was held that, where the injury is permanent and the structure is permanent, the statute of limitation begins to run from the time of the completion of the structure. In *St. L. I. M. & S. R. Co.* v. *Morris*, 35 Ark. 626, it was held that the statute began to run as soon as the company had finished its work about the embankment, trestles and ditches.

It therefore remains to be ascertained from the evidence in the instant case the dates when some essential and substantial part of the work of the district remained uncompleted, and to which the injuries complained of might be referable. The testimony on this question is undisputed, and was elicited from the engineer witnesses of the appellant. The floodway was opened in January, 1923, the last 300 feet of which was excavated with dynamite, and it is not shown when the levees on the east side of the floodway were completed, but, as is shown by the plat which was introduced by both parties, the levees run on either side of the floodway to the St. Francis River and on the right bank of the same down to the appellee's land in section 6, township 9, range 6, in Crittenden County. This floodway was but a part of the drainage district. Other essential portions of it were the levees inclosing the storage basin or reservoir and the dam across the St. Francis River. The uncontradicted evidence is that immediately upon the opening of the floodway great damage resulted to the lands of the appellee, and that the levees on the western side of the storage

basin and all the way down the west side of the floodway were finished in January, 1923, but that the dam was not put in the river until the winter of 1924 or the early part of 1925, and that the lock and dam was completed in January, 1925. This is in the testimony given by O. M. Fairley, a member of the firm of Pride & Fairley, the engineers for the appellant district, and this testimony stands uncontradicted. The dam was an essential part of the structure. It was not completed until after the original complaint was filed, and therefore, according to the uncontradicted testimony, the appellant district had not been completed within a year before the filing of the complaint, and the court correctly overruled the demurrer to the complaint and refused to submit the question of limitation to the jury.

There remains to be considered the question as to the excessiveness of the verdict which was $20,000. The damages awarded are large, but we cannot say that they are excessive. The uncontradicted testimony is to the effect that the lands of appellee were very fertile, producing from three-fourths to a bale and a half of cotton per acre according to the season and sixty bushels of corn per acre; that the lands in the tract, exclusive of waste land, amounted to 565 acres, ten acres of which was cleared when purchased by the appellee; that the purchase price for the property, exclusive of the waste land, was between twenty-three and twenty-four dollars per acre, of which sum appellee paid $5,000 in cash and from his earnings and money borrowed he spent $20,875 in clearing, fencing and otherwise improving the property. At the beginning of the year 1923 he had subdued and improved 255 acres, which made 265 acres including the ten in cultivation when he bought it. Of the 300 remaining acres half was deadened preparatory to cultivation. The lowest estimate of value placed by any of the witnesses for this property was $100 an acre for the land in cultivation and $35 an acre for the remainder. A majority of the witnesses placed the value of the cultivated land at $125

an acre. Six witnesses, including the appellee, testified as to the value of the lands. One did not testify as to the value of the uncultivated land, but two of five witnesses placed the value of the uncultivated land at $50 per acre, two at $40 per acre, and one at from $35 to $40 an acre. This testimony was not contradicted. So, while the verdict is large, it is supported not only by substantial testimony but by all the evidence. The testimony also is undisputed that this land had this value for agricultural purposes, and that this was the sole purpose to which it was adapted and that the value had been completely destroyed. It follows from the views we have expressed that the judgment of the trial court is correct, and it is therefore affirmed.

SMITH, J., dissents.